**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| Liyah Roberts and Izaiah Roberts, next of kin of the Plaintiffs' decedent, their father William Jamison Roberts, and Kenneth Roberts, as Administrator of the Estate of William Jamison Roberts,<br>Plaintiffs, | ) | |
| v. | ) | Civil Action No. |
| Ezell Brown, Sheriff of Newton County, individually and policymaking capacity; Capt. Brice Smith; Cpl. Jemon Jordan; Sgt. Alissia Thomas; Sgt. [FNU] Ramsey; A-Shift Detention Officers 1 through 5; B-Shift Detention Officers 1 through 5; Newton County, Georgia; and NaphCare, Inc., | ) | Complaint for Damages<br><br>Jury Trial Demanded<br><br>**Related to 1:25cv02239-SDG** |
| All jointly and severally, and in conspiracy with one another,<br>Defendants. | ) | |

**COMPLAINT FOR DAMAGES**
**(Jury Trial Demanded)**

COME NOW Plaintiffs Liyah Roberts and Izaiah Roberts, next of kin of their father William Jamison Roberts, and Kenneth Roberts, as Administrator of the Estate of William Jamison Roberts[1], and file this Complaint for Damages, showing the Court as follows.

---

[1] Kenneth Roberts, the decedent's father, was appointed Administrator of the Estate of William Jamison Roberts by the Probate Court of Walton County,

## I. NATURE OF THE ACTION

1. This is an action under 42 U.S.C. § 1983 and the laws of Georgia for the death of William Jamison Roberts, who was taken into the Newton County Detention Center on April 22, 2023 in obvious medical distress, held there approximately thirty hours without ever being booked, without ever being screened, and without ever being seen by a nurse, and then put out of the jail on foot. He was found dead on the grounds of the Newton County Sheriff's Office three days later.

2. He did not die of anything mysterious. The medical examiner found that he died of complications of bowel ischemia due to acute methamphetamine use. He had told the arresting deputy, on a recording, that he had not had a bowel movement in eleven days, that he had been vomiting the whole time, that he could not stop having diarrhea, that he was cramping badly, and that the pain felt "like they stabbin me." He asked to be taken to a hospital at least five times. He was taken to a jail instead.

---

Georgia on June 29, 2026, Estate No. 26-0199. The original Complaint was filed by Izaiah Roberts as putative proposed temporary administrator, no appointment having then been made. This action is **related to *Roberts v. Allen*, Civil Action No. 1:25-cv-02239-SDG, now pending before the Honorable Steven D. Grimberg, and arises from the same events.** It is filed to preserve the claims asserted herein pending the Court's disposition of Plaintiffs' motion for leave to amend in that action. Plaintiffs will move to consolidate the two actions under Fed. R. Civ. P. 42(a). A notice of related case is filed herewith pursuant to Local Rule 3.1B.

3. The reason he was never screened is not disputed by the officers who held him. They told the Georgia Bureau of Investigation that a person brought to the Newton County Detention Center on apparent public intoxication is not booked — he is held until he sobers up and then released. Because the medical provider's notification system is triggered only by a booking entry, a person who is never booked is a person the medical staff never learns about. That is what happened here, and on Plaintiffs' allegations it is what the practice was designed to do.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiffs assert claims arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States.

5. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy.

6. Venue is proper in this district and division under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Newton County, Georgia.

## III. PARTIES

7. Plaintiff Liyah Roberts is a surviving child of William Jamison Roberts and is of full age. She brings the claims for the wrongful death of her father under O.C.G.A. §§ 51-4-1 and 51-4-2(a).

8. Plaintiff Izaiah Roberts is the younger surviving child of William Jamison Roberts. He reached the age of eighteen after the death of his father and less than two years prior to the date of this filing, and tolling, not inconsistent with federal purpose and law of the federal claims shows that this action for any claim in which death of William Roberts is actionable and compensable is timely, where federal claims are entitled to state tolling, under O.C.G.A. §§ 51-4-1 and 51-4-2(a), and as to any state wrongful death claims.

9. Plaintiff Kenneth Roberts is the father of the decedent and was appointed Administrator of the Estate of William Jamison Roberts by the Probate Court of Walton County, Georgia on June 29, 2026, Estate No. 26-0199. The Letters of Administration grant the Administrator all of the powers contained in O.C.G.A. § 53-12-261. He brings the survival claims of the Estate under O.C.G.A. § 9-2-41. Attached to the **Declaration of Kenneth Roberts, (attached hereto as Exhibit 4) with Exs. A GBI investigation summary, 106 pp; B Roberts Index to GBI Invest Summary; Ex. C List of Videos with brief description by Roberts, including videos that do not have William; D Roberts Letters of Administration,** is a true copy of the public record of the Letters of Administration of Kenneth Roberts, attached thereto **as Ex. D**; which should have been filed in support of Plaintiffs' motion for leave to file amended complaint in ***Roberts v. Allen*, Civil Action No. 1:25-cv-02239-SDG.**

10. Defendant Ezell Brown was at all relevant times the Sheriff of Newton County, Georgia. He is sued in his individual capacity and as a policymaker. As Sheriff he was the final policymaker for the operation of the Newton County Detention Center, including its booking, intake, and medical screening practices, and he personally executed the Health Services Agreement with NaphCare, Inc. and each of its renewal amendments, and acted jointly and in concert with one or mor Cunty Commissioners to save money due NaphCare, by implementing the practice and custom of not booking detainees for public intoxication, which was implemented as to William Roberts, and is challenged herein.

11. Defendant Captain Brice Smith was at all relevant times the Jail Captain of the Newton County Sheriff's Office, with operational command of the Newton County Detention Center, including responsibility for its booking and intake practices, the supervision of its shift supervisors, and the training of its detention officers. He is sued in his individual capacity.

12. Defendant Corporal Jemon Jordan was at all relevant times a detention officer of the Newton County Sheriff's Office and the A-shift supervisor at the Newton County Detention Center. He is sued in his individual capacity.

13. Defendant Sergeant Alissia Thomas was at all relevant times a detention officer of the Newton County Sheriff's Office assigned to the A shift at the Newton County Detention Center. She is sued in her individual capacity.

14. Defendant Sergeant Ramsey was at all relevant times a detention officer of the Newton County Sheriff's Office and the supervisor of the B or night shift at the Newton County Detention Center. His or her first name is presently unknown to Plaintiffs; the Georgia Bureau of Investigation file identifies this Defendant only as "SGT FNU RAMSEY." Sergeant Ramsey is sued in his or her individual capacity.

15. Defendants A-Shift Detention Officers 1 through 5 are those detention officers of the Newton County Sheriff's Office who worked the A shift, 7:00 a.m. to 7:00 p.m., on April 22 and April 23, 2023, under the supervision of Corporal Jordan and Sergeant Thomas, and whose assigned posts and duties placed William Roberts within their direct or video observation. They are sued in their individual capacities.

16. Defendants B-Shift Detention Officers 1 through 5 are those detention officers of the Newton County Sheriff's Office who worked the B shift, 7:00 p.m. to 7:00 a.m., on April 22 and April 23, 2023, under the supervision of Sergeant Ramsey, and whose assigned posts and duties placed William Roberts within their direct or video observation. They are sued in their individual capacities.

17. Defendant NaphCare, Inc. is a corporation that at all relevant times contracted with Newton County, Georgia and the Office of the Sheriff to provide health care services to persons confined at the Newton County Detention Center. NaphCare acted under color of state law in performing that function.

18. Defendant Newton County, Georgia ("Newton County" or "the County") is a political subdivision of the State of Georgia, organized and existing under the Georgia Constitution and the laws of the State of Georgia. Newton County is governed by the Newton County Board of Commissioners, which consists of a chairman and five district commissioners. The Board of Commissioners is the governing authority of Newton County, Ga. Const. Art. IX, § I, ¶ III, and is authorized to exercise the legislative power of the County, including the power to appropriate county funds, enter into county contracts, and administer the county treasury.

19. At all times relevant to this action, including April 22–26, 2023, the Newton County Board of Commissioners was composed of the following members:

| | |
|---|---|
| Chairman: | Marcello Banes |
| District 1: | Stan Edwards |
| District 2: | T. Demond Mason |
| District 3: | Alana Sanders |
| District 4: | J.C. Henderson |
| District 5: | Ronnie Cowan |

20. Newton County, acting through its Board of Commissioners, entered into the NaphCare Health Services Agreement (the "Agreement") with NaphCare, Inc. to

provide medical services to persons confined at the Newton County Detention Center. The Board of Commissioners funded the Agreement through county appropriations and administered the county treasury from which payments to NaphCare were made. While the sheriff is authorized to select the jail medical provider, Bd. of Comm'rs v. Stewart, 284 Ga. 573, 573 (2008), the Board of Commissioners controls the appropriation of funds and the execution of county contracts through which the selected provider is compensated. [NaphCare K § 1.1 Bates 000001.]. **Plaintiff hereby incorporates the NaphCare Contract**, and asks the Court to take Judicial Notice of the existence and contents of the NaphCare Contract found in ***Robert, et al. v. Allen*, *et al.*, Civil Action No. 1:25-cv-02239-SDG, Doc. 56-3, provisionally under seal, which was Ex 1 attached to the complaints, redacted and unredacted. See Ex. 1 attached hereto, placeholder for NaphCare contract.**

21. Newton County is sued in this action under 42 U.S.C. § 1983 for its own policy or custom, adopted and implemented by its Board of Commissioners within the Commissioners' own lawful authority over county contracting and fiscal administration, that directly caused the constitutional deprivation alleged herein. This claim is distinct from, and does not depend upon, any claim against the sheriff in his individual or official capacity.

22. Newton County may be served through the chairman of its Board of Commissioners. O.C.G.A. § 9-11-4(e)(5). The current interim chairman is Linda D. Hays, whose office address is 1124 Clark Street, Covington, Georgia 30014.

23. Each individual Defendant acted under color of state law and within the course and scope of his or her employment.

24. **Pleading on information and belief, incorporated throughout, until discovery**. Allegations made on information and belief are specifically so identified pursuant to Fed. R. Civ. P. 11(b)(3), are based on the facts otherwise alleged herein and on the Georgia Bureau of Investigation investigative file obtained under the Georgia Open Records Act, and concern matters peculiarly within Defendants' knowledge and control — including shift rosters, post assignments, watch logs, interior jail video for April 22–23, 2023, booking and release records, medical records, training records, and the written inmate intake and intake medical screening policies that Lieutenant Michael Cunningham transmitted to the Georgia Bureau of Investigation on July 7, 2023 — none of which Plaintiffs have obtained, discovery being stayed. Each Defendant identified by description rather than by name is described as specifically as those materials permit, by shift, supervising officer, post, assignment, cell block and cell, and duty of direct or video observation, so that the person may be identified for service; the use of a descriptive designation is therefore, at worst, surplusage. *See Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992). Plaintiffs will substitute true names promptly upon obtaining the records that supply them, and this paragraph is incorporated by reference into every paragraph and count of this Complaint.

## IV. FACTS

### A. William Roberts.

25. William Jamison Roberts was born in October 1978 and was 44 years old when he died. He was the father of Liyah and Izaiah Roberts.

26. He suffered from chronic obstructive pulmonary disease and severe chronic asthma, had been prescribed a CPAP machine for sleep apnea, and took approximately eight prescribed medications, including multiple inhalers and steroids. He had been treated at Piedmont Newton emergency department.

### B. The roadside encounter, April 22, 2023.

27. On the morning of April 22, 2023, Deputy Christopher Jerrett Allen encountered William Roberts beside a disabled car near a park in Newton County. Deputy Allen's body-worn camera recorded the encounter, and a camera in his patrol car recorded the period during which Roberts was in the back seat. **Transcripts (Attached Ex. 2) of Factory_bridge_rd_1__ok.mp4 (Bodycam) and 1_Factory_Bridge_Road_6__Redacted.mp4 (Backseat) re: Doc. 52 Notice of Filing of Thumb drive with videos. Doc. 52 also has 37_20230422t145203_20230422t151811.mp4 (Intake), a video of intake with no sound.**

28. The body camera clock records Coordinated Universal Time. The patrol-car camera clock records local time. The offset is four hours, as the two

transcripts establish by recording the identical exchange at 13:52:43 and 09:52:43 respectively. All times in this Complaint are local time.

29. The encounter began at approximately 9:39 a.m. and ended when Deputy Allen delivered Roberts to the Newton County Detention Center at approximately 10:46 a.m. The entire encounter lasted about sixty-seven minutes.

30. Within five minutes Deputy Allen had formed and voiced the view that Roberts was under the influence of drugs. At 9:44:30 he said: “Dude look at your lips shit right now. You’re fucked up. Okay, don’t play games with me.”

31. At 9:44:47 Roberts answered: “I don’t know, I don’t feel good I asked if they could take me to the hospital.”

32. At 9:46:06, panting, Roberts said: “I can’t breathe man.”

33. At 9:47:09 and again at 9:47:15, after being detained, Roberts said: “I can’t breathe bro got to go to the hospital” and “I gotta go to the hospital.”

34. At 9:50:10 Deputy Allen said, of Roberts: “damn meth heads. Man.”

35. At 9:52:49, Deputy Allen said: “When was the last time you hit any of that shit? Bro, for real, I don’t want you to die in my car. Look, I’m not going to mess with you because you’ve taken something you understand me. You’re not going to be in trouble for that. But I do need to know what the hell is in your system right now. So if you fall over dead cause you got fentanyl in your ass, I know how to treat you and take care of you.”

36. At 10:00:08 Roberts said he had had nothing to drink "all day and half the day yesterday." At 10:00:16 Deputy Allen said: "bro, your lips are black." At 10:00:32 he added, "I don't see any inhalers in the car," and at 10:00:49, "pretty sure I never heard of inhalers doing this to you."

37. At 10:05:08 Deputy Allen told Roberts what he intended to do: "So stead of trying to bust your ass too hard. What I'm gonna do is just a local ordinance which lets you sober up. So I'm gonna do a little local ordinance on you. It lets you sober up in county jail, okay, and you'll be able to get straight out. But I want you, I want you sober before you do anything."

38. Deputy Allen thereby selected the charge that, under the practice alleged below, results in a detainee not being booked and therefore never being seen by medical staff.

39. At 10:05:29 Roberts said: "I have to take that medicine. I can't breathe bro." At 10:05:37: "I swear on my life man I fucking need somethin to drink." Deputy Allen replied at 10:05:44: "Yeah, I know you do. I don't have anything to give you to drink."

40. At 10:06:49 Roberts said: "I can't breathe I ain't gonna get all my medicine. Gonna be bad for me I need to go to the hospital right now."

41. Then, at 10:08:12, Roberts made his final request:

> 10:08:12 Roberts: "Take me to the hospital, at least do me that, please"

> 10:08:17 Allen: “We have nursing staff, Sir,”
>
> 10:08:18 Roberts: “Nurses ain’t gone they ain’t no lung doctor man they don’t know what to do”

42. Deputy Allen refused the hospital on the express ground that the jail had nurses. No nurse ever saw William Roberts.

43. At approximately 10:10, Roberts described the condition that would kill him:

> “I really need something to drink man… Dehydrated, I got the shits. I been puking. … smell like death there’s something wrong with me man ain’t nobody listen. Hurts so bad feels like I don’t know they stabbin me. got cramps real bad. I mean, I ain’t shit for 11 days and puke the whole time now I can’t stop shittin.”

44. Eleven days of obstruction, followed by uncontrollable diarrhea, persistent vomiting, severe cramping and stabbing abdominal pain, reported by the detainee to the arresting officer, approximately forty-eight minutes before he was placed in a holding cell that had no restroom.

45. At 10:12:58 Roberts said: “I got cancer, chronic COPD I take four or five inhalers every day… steroids every day. Antidepressants.” At 10:15:01: “feel weird, I feel dizzy, I’m whoozy as hell right now… I’m going to pass out knock teeth out and plus I’m dehydrated.”

46. At 10:15:12 Deputy Allen answered: “you know why you’re dehydrated cause of shit you’ve Taken That’s what meth does. Dehydrates you.”

47. The Newton County Sheriff's Office paperwork recorded that Roberts was "under influence of unknown narcotic broke down on roadside was using bathroom in public."

**C. Intake at the Newton County Detention Center.**

48. Deputy Allen brought Roberts into the intake area of the Newton County Detention Center at approximately 10:52 a.m. on April 22, 2023. The intake video bears the file designation 37_20230422t145203_20230422t151811.mp4 and was filed with this Court at Doc. 52. It has no audio.

49. On that video, Roberts sits in a chair beside the intake computer. He is visibly in distress — rocking back and forth, bending over with his head in his hands, wringing his hands, and holding his stomach. He is in nearly constant motion. **See Dec. of Kenneth Roberts, ¶ 11, Exhibit 4.**

50. Deputy Allen spent approximately nine minutes at the intake computer. William Roberts was not booked in. Id.

51. Approximately twelve minutes into the video, Sergeant Alissia Thomas appeared at the interior door to intake. She spoke with Deputy Allen and with Roberts, and Roberts can be seen on the recording visibly pleading his case to both of them. Id.

52. At approximately 10:58 a.m., Deputy Allen placed William Roberts in a holding cell that had no restroom, as Sergeant Thomas walked toward him. Roberts had told Deputy Allen he could not stop having diarrhea.

53. Deputy Allen left the intake area. Sergeant Thomas returned to the intake computer. She then left the computer, looked over at William Roberts's cell, and walked back into the jail.

54. Shortly afterward, Sergeant Thomas walked back into intake with a different inmate and proceeded to book that inmate in. She then walked toward Roberts's cell and said something to him, and returned to the computer.

55. On information and belief, at no time during the intake process did any Defendant take a vital sign, perform or request a health screening, summon a member of the medical staff, enter William Roberts into the Eagle booking system, or generate any notification in the TechCare medical record system.

**D. Approximately thirty hours.**

56. William Roberts remained in the Newton County Detention Center from approximately 10:52 a.m. on April 22, 2023 until approximately 5:52 p.m. on April 23, 2023 — approximately thirty hours.

57. The A shift ran from 7:00 a.m. to 7:00 p.m. The B shift ran from 7:00 p.m. to 7:00 a.m. Corporal Jordan was the A-shift supervisor. Sergeant Ramsey was the B-shift supervisor.

58. Roberts was therefore in the jail for the entire B shift of 7:00 p.m. on April 22 to 7:00 a.m. on April 23 — a full, uninterrupted twelve-hour shift under the supervision of Sergeant Ramsey — and for substantial portions of the A shift on both days.

59. On information and belief, during those approximately thirty hours no Defendant obtained a medical assessment of William Roberts, took a vital sign, offered him fluids, or referred him to the medical staff on duty.

60. NaphCare medical staff were on duty in the facility throughout. Bridgett Eiland, Stephen Perry and Donna Roundtree were on duty on April 22, 2023 when Roberts was brought in. Gregory Lowe, Stephen Perry and Donna Roundtree were on duty on April 23, 2023 when he was released.

**E. Release, and death.**

61. At approximately 5:52 p.m. on April 23, 2023, Corporal Jordan brought William Roberts out of the jail into the intake area, directed him to a property bag on top of a cabinet, opened the exterior door, and let him out on foot. The only assessment that preceded the release was a custody officer's view that Roberts was "acting better."

62. Approximately three minutes after Roberts was put out of the building, a nurse came out of the jail into the intake area and spoke with an officer

there. Medical staff were within feet of the door through which Roberts had just been released.

63. No one notified any member of William Roberts's family that he was being released, or that he had been in the jail at all.

64. Roberts walked out alone, carrying a cup. He bent over on the driveway. He used a portable toilet on the grounds. He then lay down behind the Newton County Sheriff's Office entrance sign.

65. He was found motionless on the grounds of the Newton County Sheriff's Office at approximately 8:00 a.m. on April 26, 2023, by a yard crew, and was pronounced dead at 9:35 a.m.

**F. The family called the jail every day.**

66. Between April 21 and April 25, 2023, members of William Roberts's family called the Newton County Detention Center every day to ask whether he was there. They were told each time that he was not there.

67. He was there. He had been brought in on April 22 and was in a holding cell. On Plaintiffs' allegations, the reason the jail could truthfully report no record of him is that he had never been booked — which is the practice alleged below operating exactly as designed.

68. Had the family been told he was in custody, they could have brought his prescribed medications, informed the jail of his chronic obstructive pulmonary disease and asthma, or arranged for his release and transport to a hospital.

**G. The medical cause of death.**

69. The medical examiner determined the cause of death to be complications of bowel ischemia due to acute methamphetamine use, and the manner of death to be accident.

70. The autopsy found blotchy full-thickness dark purple discoloration of the small bowel; black ischemic necrosis of the colonic mucosa with sharp demarcation; and a colonic lumen containing abundant dark purple, blood-tinged, watery stool.

71. The autopsy also documented trauma: a 3.5-inch red abrasion of the right brow; a red abrasion of the left brow; contusions of both ears; contusions of the left chest, left flank, right shoulder and lateral right buttock; and cortical congestion concerning for minute subarachnoid hemorrhage.

72. Bowel ischemia is a progressive condition. On information and belief, had William Roberts received a medical assessment at any point during the approximately thirty hours he was held, he would have been transported to a hospital and would have survived.

**H. The practice: taken to jail, but not booked — and therefore never seen.**

73. Corporal Jemon Jordan told the Georgia Bureau of Investigation that public intoxication is not a finger printable offense; that such an arrestee is held approximately eight hours and then released on his own recognizance; and that "sometimes the jail would allow inmates to sober up and then let them go."

74. Sergeant Alissia Thomas told the Georgia Bureau of Investigation that William Roberts "may not have been booked because of drunk behavior," and that "if a deputy brings in a drunk person sometimes, they let them sober up and then let back out." **See Roberts Dec. Ex. A, GBI invest summary, p. 50. Attached Ex. 4.**

75. Corporal Jordan described Roberts as behaving erratically, incoherent, refusing to answer questions, talking to himself, walking the cell saying he needed to use the bathroom and needed to defecate, and unable at first to be dressed out. He believed the intoxication was alcohol rather than drugs.

76. Sergeant Thomas described Roberts as under the influence of alcohol and drugs, arrested where homeless people stay, and having defecated on the side of the street.

77. Corporal Jordan told the Georgia Bureau of Investigation that Roberts "was seen by medical at intake." That statement is false.

78. Amber Colley, the NaphCare Health Services Administrator at the Newton County Detention Center, explained the mechanism. The Sheriff's Office uses a system called Eagle. NaphCare uses a system called TechCare. Once a person is booked into Eagle, Eagle notifies TechCare, the intake nurse is alerted in real time, and medical staff generally see the detainee within about three hours of booking.

79. Ms. Colley further stated that "in some cases when inmates might be having a [mental] crisis, the jail staff would just notify them since the notifications in Tech Care would not appear until the person was booked into the NCSO jail through Eagle."

80. That statement establishes two things. The medical provider's notification system cannot reach a detainee who is never booked. And a manual workaround existed, was known to jail staff, and was used for other categories of detainee. No one used it for William Roberts.

81. At the request of the Georgia Bureau of Investigation, Ms. Colley searched the TechCare system for William Roberts using the correct spelling of his first and last name, alternate spellings, and alternate name placement. The search returned no record of William Roberts at all. The NaphCare staff on duty had no recollection of him.

82. Ms. Colley also stated that she learned of William Roberts's death only through news reports, and that she "had not been told anything by the NCSO about the incident."

83. Asked what the medical response would be to a detainee with severe diarrhea, Ms. Colley stated that medical staff would provide fluids and medication, would be concerned about dehydration causing an elevated heart rate, would take vital signs, and would determine from those vital signs and the response to treatment whether the detainee needed to be taken to the hospital. None of that occurred, because no one in medical ever knew William Roberts was in the building.

84. On information and belief, the practice of holding arrestees brought to the Newton County Detention Center on apparent public intoxication without booking them — and therefore without any medical screening — was a longstanding and widespread practice at the facility, applied to numerous detainees before and after April 2023, and was known to and permitted by Sheriff Ezell Brown.

**I. The danger has been recognized for generations.**

85. For as long as there have been jails, those who keep them have received prisoners who were drunk, drugged, or in withdrawal. The intoxicated

arrestee is among the most ordinary occupants of an American jail, and the risk he presents has been understood for generations.

86. The practice of treating withdrawal inside a jail is old enough to appear in statute. New York's Correction Law provides, under the heading "Use of liquor in jails," that "[s]pirituous, fermented or other liquor shall not be brought into a jail for the use of a person confined therein" — except upon "a written permit by the physician to the jail," stating the quantity and kind of liquor, the prisoner for whom it is intended, and the period covered. N.Y. Correct. Law § 502. Alcohol was among the recognized treatments for delirium tremens, and its prescription for that purpose persisted in American hospitals into the present century.

87. The remedy has changed; the principle has not. For well over a century it has been understood that a prisoner in withdrawal is a medical patient, and that a physician, not a jailer, decides what he needs.

88. Beginning in the 1960s the range of substances from which a person may overdose or withdraw expanded far beyond alcohol — to opioids, benzodiazepines, cocaine, and stimulants including methamphetamine. Each carries its own pattern of intoxication and withdrawal, and several can kill.

89. In 1976 the Supreme Court of the United States held that "deliberate indifference to serious medical needs of prisoners" violates the Constitution, and

that this is true "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

90. In 1972 the American Medical Association surveyed medical services in the nation's jails and found them inadequate and disorganized. By 1978 the AMA had published *Standards for the Accreditation of Medical Care and Health Services in Jails*, designating each standard "essential" or "important" and conditioning accreditation on compliance. The 1979 edition gave detailed attention to chemically dependent inmates and to how to detect, treat, and refer them.

91. Georgia was not a bystander. A federally prepared assessment published in 1980 reported that five Georgia jails served as original pilot sites for testing the AMA standards and the accreditation process, and that three Georgia jails were then accredited.

92. In 1983 the AMA program became an independent organization — the National Commission on Correctional Health Care — which continued the accreditation program the AMA had begun.

93. By January 1987 the national standards stated the rule that governs this case. Standard J-31, an essential standard, required receiving screening "to be performed by health-trained or qualified health care personnel on all inmates" immediately upon arrival at the jail. Standard J-52, also essential and titled

*Intoxication and Withdrawal*, required that "[i]nmates experiencing severe, life-threatening intoxication (overdose) or withdrawal are immediately transferred" for care, and that "[d]etoxification is done only under medical supervision in accordance with local, state, and federal laws."

94. That was thirty-six years before William Roberts was taken into the Newton County Detention Center.

95. The professional literature said the same across the same period. In 2004 a peer-reviewed article in the *Journal of Law, Medicine & Ethics* described "a serious, but neglected problem in jails across the country: inadequate assessment and treatment of drug and alcohol withdrawal among arrestees," and showed that untreated withdrawal "is associated with adverse outcomes including needless pain and suffering, medical morbidity, and in some instances, death." In 2015 the National Commission on Correctional Health Care published guidance stating that "[m]edical detoxification must be conducted under the supervision of a physician" and that "[a]ll staff should learn to recognize the signs and symptoms of alcohol, sedative/hypnotic, and opioid withdrawal."

96. The edition of the NCCHC standards in force in April 2023 was the 2018 edition. Its Essential standards included J-A-01 Access to Care; J-E-02 Receiving Screening; J-C-04 Health Training for Correctional Officers, which requires that correctional officers be trained to recognize the need to refer and

whose compliance indicators expressly include intoxication and withdrawal; and J-F-04 Medically Supervised Withdrawal and Treatment, which requires that individuals showing signs of intoxication or withdrawal be monitored by qualified health care professionals.

**J. Georgia requires this training, and Georgia law supplied the remedy.**

97. No person "shall be authorized to serve as a jail officer in any detention facility" in Georgia unless he or she has "successfully completed a training course for jail officers approved by the Georgia Peace Officer Standards and Training Council," and must do so within six months of initial employment. O.C.G.A. § 35-8-24(a)(1), (b). Peace officers must complete a basic training course. O.C.G.A. § 35-8-9. Every certified officer must complete twenty hours of continuing education each calendar year, on pain of losing "his or her power of arrest." O.C.G.A. § 35-8-21.

98. **The Basic Jail Officer Mandate Course, Student Reference Text, Revised 2022 was the training text in force in April 2023. A copy is attached as Exhibit 3**. On information and belief, each Defendant detention officer completed that course.

99. That text instructs Georgia jail officers, in terms:

> "A significant percentage of newly admitted inmates have a dependence on alcohol and/or drugs. Untreated withdrawal can be fatal. A quick referral to medical staff is required. Screening at intake

should include questions around: Substances abused • Time last used • Frequency of use • Past treatment • Suicidal ideation” [Ex. 3 at 8]

100. And twice on the same page: “Rapid referral to medical staff for those reporting heavy use of alcohol or drug use should take place.” The text teaches that “[s]timulant abusers may appear quite excited, talkative and active” and “may become irritable, argumentative or upset,” and lists the symptoms of withdrawal, including difficulty thinking clearly, sweating, nausea, vomiting, rapid heart rate, dilated pupils, clammy skin, abnormal movements and tremor. [Ex. 3 at 8–9.]

101. The same text instructs Georgia jail officers on O.C.G.A. § 42-4-12, which it quotes in full:

> “A sheriff, constable, keeper of a jail, or other officer whose duty it is to receive persons charged with or guilty of an indictable offense shall be authorized to refuse acceptance of any person who has not received medical treatment for obvious physical injuries or conditions of an emergency nature. Upon such refusal, it shall be the responsibility of the arresting agency to take the individual to a health care facility or health care provider in order to secure a medical release.”

102. The text then tells the booking officer what triggers that duty:

> “The booking officer must be knowledgeable of the jail’s policy as to the conditions that would warrant refusal of an arrestee… Conditions that warrant refusal are: injuries in obvious need of medical attention that is not available at the jail, a medical condition such as high blood pressure or diabetes and the arrestee states he/she has not taken his/her medication as directed, or extreme intoxication from drugs or alcohol.” [Ex. 3 at 20–21]

103. William Roberts presented two of the three listed conditions. He was, on every Defendant’s account, extremely intoxicated. And he told Deputy Allen repeatedly, on the recording, that he had not taken his prescribed medication.

Corporal Jordan's belief that the intoxication was alcohol rather than drugs is immaterial: the training text names "drugs or alcohol."

104. Upon such a refusal the training text requires the booking officer to document the arrestee's name, the agency and officer who brought him in, the charge, the condition that warranted the refusal, the date and time, and the supervisor notified. No such refusal was made and no such documentation exists.

105. The same text requires a health screening of every detainee:

> "All new inmates must undergo a health screening as soon as possible after admission to the jail. Illness or injuries that are left untreated may become more severe, requiring hospitalization… A medical staff member should conduct the health screening if possible. If a medical staff member is not available, a jail officer must conduct the health screening. Jail officers responsible for health screenings must receive specific training to learn what questions to ask, what to look for, and when to refer the inmate to medical." [Ex. 3 at 21]

106. NaphCare medical staff were on duty on both April 22 and April 23, 2023. No health screening of any kind was performed by anyone.

107. The same text teaches Georgia jail officers the constitutional standard by name, instructing that in *Estelle v. Gamble* "[t]he U.S. Supreme Court held that 'deliberate indifference' by prison workers to an inmate's serious illness or injury violates the amendment," and that "[d]enying or delaying access to medical care … can result in discipline, termination, or even civil or criminal action." [Ex. 3 at 199.]

108. Georgia law independently imposes the duty on the Sheriff. He must "furnish persons confined in the jail with medical aid," and is liable for neglect of that duty. O.C.G.A. § 42-4-4(a)(2); *see also* § 42-4-51.

109. The Georgia General Assembly has declared that a drug overdose is a medical emergency requiring a call for help. The Georgia 9-1-1 Medical Amnesty Law, enacted in 2014, immunizes from drug prosecution any person who "in good faith seeks medical assistance for someone experiencing a drug overdose," and the overdosing person as well. O.C.G.A. § 16-13-5.

110. Even the voluntary minimum standards published by the Georgia Sheriffs' Association require that the booking function include "Intoxication determination" (Std. 8.48); that every facility maintain "at a minimum, one special purpose cell for the temporary detention of persons under the influence of alcohol or narcotics" (Std. 8.52); and that "[r]eceiving screening shall be performed by the booking officer or designee on all inmates upon admission" (Std. 14.13).

111. By April 2023, Deputy Allen and every officer with whom William Roberts had contact at the Newton County Detention Center had been trained, or by law should have been trained, to recognize the signs of intoxication, overdose, and withdrawal described above, and had been trained that a person presenting those signs must be referred for medical assessment rather than left to sober up. That training is documented, and the documentation is mandatory: Georgia law

requires the Peace Officer Standards and Training Council to maintain each officer's training record, and the policy in force at this facility requires that "[d]ocumentation of all training and continuing education will be maintained by the Training Officer and the Health Services Administrator." Those records will establish, officer by officer, what each Defendant was taught and when.

112. Each Defendant law enforcement officer, from the Sheriff, to the new deputy, knew — from training the State of Georgia required him to receive — important signs of overdose and withdrawal, and that when the signs were there, the officer had no discretion but to have medically trained personnel take over assessment, observation and care, but if the jailers' responses to the GBI investigation are true, no officer sought medical assessment or involvement; and the GBI investigation did not interview any of the NaphCare personnel who were on the front lines and worked April 22-23.

**K. The Sheriff contracted for these standards, and signed the contract himself.**

113. Newton County, Georgia, Office of the Sheriff, contracted with NaphCare, Inc. for the provision of health care services at the Newton County Detention Center. The Health Services Agreement and its amendments, together with the NaphCare Health Care Policy & Procedure Manual as applied to this facility, Bates numbered *Roberts v. Lowe* 000001 through 000336. **[Exhibit 1 is a placeholder for the NaphCare Contract, filed under seal; the public version of**

**this Complaint redacts verbatim quotations only.]** ***Robert, et al. v. Allen, et al.*****, Civil Action No. 1:25-cv-02239-SDG, Doc. 56-3, provisionally under seal, which was Ex 1 attached to the complaints, redacted and unredacted. See Ex. 1 attached hereto, placeholder for NaphCare contract.**

114. Sheriff Ezell Brown personally signed the Agreement and each of its renewal amendments, including the amendment exercising option renewal year four, effective July 1, 2022 through June 30, 2023 — the period during which William Roberts was taken into his jail and died. [Bates 000028.]

115. The Agreement bound NaphCare to constitutional and national standards. § 1.1 [Bates 000001]

116. The Agreement required medical evaluation before booking. Medical staff is required to evaluate, prior to booking, any inmate that has an obvious or known illness or injury, and such inmate must be cleared medically prior to booking. § 1.8 [Bates 000002]

117. That provision is the contractual mirror of O.C.G.A. § 42-4-12. Had either been followed, William Roberts would have been medically evaluated before he was placed in a cell.

118. The Agreement states that the facility is accredited. NaphCare's services will be designed to meet or exceed the standards developed by the American Correctional Association (ACA) and the National Commission on

Correctional Health Care (NCCHC). § 3.1 and the operational plans, implementation process, orientation activities, and training programs shall meet or exceed ACA and NCCHC standards. § 3.2 . The Facility was currently accredited by NCCHC. § 3.3 [Bates 000005]

119. The Agreement required NaphCare to train the Sheriff's correctional officers including for first aid, signs and symptoms of chemical dependency, reactions to medical emergencies. § 4.1 [Bates 000005]

120. NaphCare remains responsible for its subcontractors. § 2.5 [Bates 000004]

121. The operative policies placed the duty to find and remove barriers to care on NaphCare's own administrator. Policy A-01 required the responsible health authority to identify and eliminate unreasonable barriers to a patient's access to health care, naming among them any interference with the prompt transmittal of a patient's request for care to health care staff; required the Health Services Administrator to notify NaphCare's corporate office of potential barriers; and required health staff to work with custody on access issues, including centralizing patients undergoing withdrawal. [Bates 000035.] The Newton County addendum required that care be delivered without unreasonable barriers to timely and clinically appropriate care. [Bates 000036.]

122. Policy A-02 designated who holds that duty, and forbade custody staff from making medical decisions. It designated the onsite Health Services Administrator as the responsible health authority, charged with ensuring accessibility of timely health care to all patients, and provided that non-health care personnel would make no medical decisions. [Bates 000037.]

123. The operative receiving-screening policy required exactly what did not happen here. Policy E-02 required a receiving screen on all patients by qualified health care professionals as soon as possible upon intake, and required reception personnel to ensure that any patient who was severely intoxicated, in active drug or alcohol withdrawal, or otherwise urgently in need of immediate medical attention was referred for appropriate care and medical clearance into the facility, documented on a Pre-Booking Triage form or a Pre-Booking Hospital Referral form. [Bates 000202.] It further required health staff to monitor receiving screenings regularly to determine the safety and effectiveness of the process. [Bates 000203.] Newton County adopted the policy without modification. [Bates 000205.]

124. The operative withdrawal policy listed the referral triggers. Policy F-04 required that all patients entering the institution be screened for any history of manifesting symptoms of intoxication or withdrawal from alcohol or other drugs; required that the history of alcohol and drug use be obtained as an integral part of

the intake and booking procedure; required that a patient exhibiting severe, life-threatening symptoms be transferred to a contracted, licensed outside medical facility; and required that a patient appearing intoxicated or in withdrawal be referred to health care staff for evaluation of enumerated symptoms, among them agitation, nausea, vomiting or diarrhea, disorientation to person, place or time, and lack of coordination. [Bates 000271–76.] Newton County adopted it without modification. [Bates 000276.]

125. William Roberts exhibited at least four of the nine listed referral triggers — agitation, diarrhea, disorientation, and lack of coordination.

126. The operative training policy made officer training NaphCare's responsibility. Policy C-04 provided that the training program would be established and approved by the responsible health authority; required that it cover recognizing the need for emergency care in life-threatening situations including withdrawal, intoxication and withdrawal generally, and the procedures for referring patients with health complaints to health care staff; required that documentation of all training be maintained by the Training Officer and the Health Services Administrator; and required that at least seventy-five percent of the correctional staff present on each shift be current in health-related training. [Bates 000129–30.] Newton County adopted it without modification. [Bates 000131.]

127. On information and belief, NaphCare never identified the barrier to access created by the practice of not booking intoxicated arrestees; never notified its corporate office of that barrier; never conducted the officer health education the Agreement required; and never monitored receiving screenings to determine whether the process was safe or effective — and the records establishing each of those failures are in NaphCare's possession.

**L. Records that would answer these questions have not been produced.**

128. The Georgia Bureau of Investigation requested the interior jail video for April 22 and April 23, 2023. The Newton County Sheriff's Office twice produced video dated May 22 and May 23, 2023 instead. **See Dec. of Kenneth Roberts, ¶ 8 Ex. 4.**

129. The only April 2023 video of William Roberts inside the facility covers approximately sixteen minutes at intake on April 22 and approximately seventeen minutes at his release on April 23. No video of his holding cell, or of any area in which he was held during the intervening thirty hours, has ever been produced. Hundreds of additional video files identified in the investigative file were never produced. Id.

130. On July 7, 2023, Lieutenant Michael Cunningham of the Newton County Sheriff's Office transmitted to the Georgia Bureau of Investigation "a copy of the intake medical screening policy and the inmate intake policy." Those

policies exist, were collected by a state investigative agency, and have a named custodian. Neither has been produced to Plaintiffs. Id.

131. No shift roster, post assignment sheet, or watch log for April 22 or April 23, 2023 has been produced. No training record for any Defendant has been produced. No Pre-Booking Triage form or Pre-Booking Hospital Referral form has been produced.

132. The Georgia Bureau of Investigation interviewed the A-shift supervisor and the A-shift sergeant. It interviewed no officer who worked the B shift, no chief jailer or assistant chief jailer, no medical provider who worked on April 22 or 23, and no detainee housed with or near William Roberts.

## V. TIMELINESS

133. Claims under 42 U.S.C. § 1983 borrow Georgia's two-year personal injury limitation period, O.C.G.A. § 9-3-33, together with Georgia's tolling rules.

134. The Estate's survival claims are timely. Under O.C.G.A. § 9-3-92, the running of the limitation period against a decedent's estate is suspended until a representative is appointed, not to exceed five years. Kenneth Roberts was appointed Administrator on June 29, 2026. The Estate's claims for the deprivation of medical care during the period of custody are therefore timely.

135. The wrongful death claims are timely. The wrongful death claim belongs to the next of kin, not the Estate. O.C.G.A. § 51-4-2(a). Under O.C.G.A. §

9-3-90(b), the limitation period does not run against a minor; it begins when the minor reaches eighteen. Izaiah Roberts, the younger child, reached eighteen in at the end of October 2024.

136. Because these claims are independently timely, Plaintiffs do not rely on relation back under Fed. R. Civ. P. 15(c) as to any newly named Defendant. Plaintiffs plead relation back in the alternative and preserve it solely in the event the Court should conclude otherwise.

## VI. CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983 — Fourteenth Amendment
### Against Sheriff Ezell Brown, in his individual capacity
### The practice of holding intoxicated arrestees without booking or medical screening

137. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 27–47, 48–55, 56–60, 61–65, 69–72, 73–84, 97–112, 113–127, and 133–136 as if fully set forth herein.

138. As Sheriff of Newton County, Ezell Brown was the official responsible for the operation of the Newton County Detention Center and the final policymaker for its booking, intake, and medical screening practices.

139. A practice existed at the Newton County Detention Center under which a person brought to the jail on apparent public intoxication was not booked. He was placed in a holding cell, held until he appeared sober, and released. The

practice was described to the Georgia Bureau of Investigation by the Sheriff's own A-shift supervisor and A-shift sergeant.

140. Because the medical provider's notification system was triggered only by a booking entry in the Eagle system, a detainee who was never booked was a detainee the medical staff never learned about. The practice therefore did not merely delay medical screening. It eliminated it for an entire category of detainee — the category at the highest risk of overdose and withdrawal.

141. Sheriff Brown knew, or the risk was so obvious that he must be charged with knowing, that persons taken into his jail on apparent public intoxication may be overdosing or withdrawing from alcohol or other drugs, and that such persons can die without medical assessment.

142. That knowledge is established, in the alternative and cumulatively, by each of the following:

a. The accreditation he contracted and paid for. The Agreement he signed states that the facility is accredited by the National Commission on Correctional Health Care and obliges the County to pay for accreditation renewal during the contract term. [¶ 112.] NCCHC accreditation rests on the premise that detainees are screened on arrival and that intoxication and withdrawal are referred for medical evaluation.

b. The contract terms he signed. Sections 1.1, 1.8, 3.1, 3.2 and 4.1 of the Agreement — executed by Sheriff Brown personally, and renewed by him for the term covering April 2023 — required constitutional and NCCHC standards of care, medical evaluation and clearance prior to booking for any inmate with an obvious or known illness, and ongoing health education for his own correctional officers on the signs and symptoms of chemical dependency and reactions to medical emergencies.

c. The training his officers were required by state law to receive. The Georgia Basic Jail Officer Mandate Course text instructs that "[u]ntreated withdrawal can be fatal" and that "[a] quick referral to medical staff is required," and that "extreme intoxication from drugs or alcohol" is a condition warranting refusal of an arrestee under O.C.G.A. § 42-4-12.

d. His own statutory duty. O.C.G.A. § 42-4-4(a)(2) requires the Sheriff to furnish persons confined in his jail with medical aid and makes him liable for neglect of that duty.

e. A pattern of prior instances. On information and belief, the practice was longstanding and widespread, was applied to numerous detainees

before April 2023, and produced prior instances in which detainees held on apparent public intoxication received no medical screening.

f. The admissions of his own supervisory staff, who described the practice to the Georgia Bureau of Investigation as a routine way the jail operated.

143. Sheriff Brown created, approved, maintained, or knowingly acquiesced in that practice, and failed to take any step to stop it, notwithstanding that it stripped the highest-risk detainees of any access to the medical care he had contracted to provide them.

144. Sheriff Brown was actually, subjectively aware that his own conduct — maintaining a practice under which a category of detainee is never booked, and therefore never reaches the only mechanism by which medical staff learn of a detainee — caused a substantial risk of serious harm to persons in that category, and he disregarded that risk by doing nothing. He did not respond reasonably to the risk; he did not respond at all.

145. The practice was the moving force behind the deprivation of William Roberts's rights. Deputy Allen selected the charge that triggered it. Corporal Jordan applied it. Roberts was never booked, never entered into Eagle, never generated a notification in TechCare, and never seen by a nurse, through approximately thirty hours of worsening bowel ischemia.

146. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count.

147. Qualified immunity does not apply. It was clearly established well before April 2023 that a jail official violates the Constitution by denying or delaying access to medical care for a detainee with an objectively serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The right was clearly established to these Defendants with unusual particularity, because the State of Georgia required them to be taught it by name: the mandatory Basic Jail Officer course text instructs that "'deliberate indifference' by prison workers to an inmate's serious illness or injury violates the amendment," and that "[d]enying or delaying access to medical care… can result in discipline, termination, or even civil or criminal action." A reasonable sheriff in April 2023 would have understood that maintaining a practice which guarantees that a category of detainees intoxicated, overdosing, withdrawing or otherwise showing signs of poisoning, regardless of whether by legal or illegal substances, receives no medical assessment, and therefore care, at all, violates the Fourteenth Amendment.

**COUNT II**
**42 U.S.C. § 1983 — Fourteenth Amendment**
**Against NaphCare, Inc.**

148. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 48–55, 56–60, 61–65, 69–72, 73–84, 85–96, 113–127, 128–132, and 133–136 as if fully set forth herein.

149. NaphCare, Inc. contracted with Newton County and the Office of the Sheriff to provide the medical care the State is constitutionally obliged to furnish to those it incarcerates. In performing that function NaphCare acted under color of state law. *West v. Atkins*, 487 U.S. 42, 54 (1988).

150. A private entity that contracts with a county to provide medical services to inmates "performs a function traditionally within the exclusive prerogative of the state" and becomes "the functional equivalent of the municipality." *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997). NaphCare is therefore liable for its own policies, customs, and deliberate failures.

151. First: NaphCare never built a mechanism to perform the pre-booking evaluation it promised. Section 1.8 of the Agreement required medical evaluation and medical clearance of any inmate with an obvious or known illness before that inmate was booked. [¶¶ 113–15.] NaphCare's own policy E-02 required that a severely intoxicated detainee or one in active drug or alcohol withdrawal be referred for care and medical clearance, documented on a Pre-Booking Triage

form. Yet NaphCare's only notification trigger was a booking entry in Eagle. A person the contract said must be seen before booking could therefore never be seen at all. That is not an employee's lapse; it is a structural gap between what the corporation promised and what it built.

152. Second: NaphCare failed to train the correctional officers it had contracted to train. Section 4.1 of the Agreement obliged NaphCare to provide ongoing health education to the Sheriff's correctional officers, expressly covering the signs and symptoms of chemical dependency and responses to medical emergencies. [¶¶ 118–19.] Policy C-04 made that training program the responsibility of NaphCare's own responsible health authority and required that at least 75% of the correctional staff present on each shift be current in it. Corporal Jordan believed Roberts was intoxicated on alcohol rather than drugs and referred him to no one. Sergeant Thomas knew he was on alcohol and drugs and referred him to no one. Either the training never occurred or it failed, and NaphCare holds the records either way.

153. Third: NaphCare never identified or eliminated the barrier to access that killed William Roberts. Policy A-01 placed on the responsible health authority the duty to identify and eliminate unreasonable barriers to a patient's access to health care, expressly including interference with the prompt transmittal of a request for care to health care staff; required the Health Services Administrator to

notify the corporate office of potential barriers; and required health staff to work with custody on access issues "including centralizing patients undergoing withdrawal." Policy E-02 required health staff to "regularly monitor[] receiving screenings to determine the safety and effectiveness of this process." A booking-triggered notification system, operating in a jail that does not book a whole category of detainee, is precisely such a barrier. Four separate written mechanisms existed to find it. None did.

154. Fourth, in the alternative: NaphCare knew of the practice and acquiesced in it. NaphCare knew its notification depended solely on booking. Its Health Services Administrator knew that jail staff sometimes notified medical manually because "notifications in Tech Care would not appear until the person was booked." On information and belief NaphCare knew that the jail held public-intoxication arrestees without booking them, and took no step to close the gap.

155. Each of these was a policy, custom, or deliberate failure of NaphCare itself, reflecting deliberate indifference to the obvious and substantial risk that detainees in acute intoxication or withdrawal would receive no medical attention. The need for the omitted measures was so obvious, and their absence so likely to result in constitutional violations, that NaphCare's failure constitutes deliberate indifference even absent a prior pattern. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

156. These policies and failures were the moving force behind the deprivation. NaphCare had no record of William Roberts because nothing in the system NaphCare built could create one.

157. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count.

## COUNT III
## 42 U.S.C. § 1983 — Fourteenth Amendment
## Against Sheriff Ezell Brown, in his individual capacity
## Failure to train and supervise

158. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 48–55, 56–60, 73–84, 97–112, 113–127, and 133–136 as if fully set forth herein.

159. Sheriff Brown was responsible for the training and supervision of the detention officers who staffed his jail.

160. The need to train detention officers to recognize intoxication, overdose and withdrawal, and to refer such detainees for medical assessment rather than hold them to sober up, was obvious. Those officers are the only persons who see an arrestee at the moment of arrival. In a jail operating the practice alleged in Count I, they are the only safeguard.

161. Sheriff Brown failed to train and supervise his detention officers to recognize those conditions and to make the referral, and failed to ensure that the officer health education NaphCare had contracted to provide under § 4.1 of the Agreement and policy C-04 was in fact delivered and documented, including the requirement that at least 75% of the correctional staff present on each shift be current in health-related training.

162. He further failed to train or supervise his officers in the exercise of the authority O.C.G.A. § 42-4-12 confers — to refuse acceptance of an arrestee presenting a condition of an emergency nature and to require the arresting agency to obtain a medical release — notwithstanding that the state-mandated training text names “extreme intoxication from drugs or alcohol” as a condition warranting refusal.

163. On information and belief, no officer at the Newton County Detention Center refused acceptance of William Roberts, documented a refusal, performed a health screening, or made a referral, because the practice Sheriff Brown maintained taught them to do the opposite.

164. The failure to train and supervise amounted to deliberate indifference to the rights of persons taken into the jail on apparent public intoxication, and was the moving force behind the deprivation of William Roberts’s rights.

165. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count. Qualified immunity does not apply, for the reasons stated in Count I.

**COUNT IV**
**42 U.S.C. § 1983 — Fourteenth Amendment**
**Against Corporal Jemon Jordan, in his individual capacity**

166. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 27–47, 48–55, 56–60, 61–65, 69–72, 73–84, 97–112, and 133–136 as if fully set forth herein.

167. Corporal Jordan was the A-shift supervisor at the Newton County Detention Center and received William Roberts into the facility on April 22, 2023.

168. Corporal Jordan personally observed Roberts behaving erratically, incoherent, refusing to answer questions, talking to himself, walking the cell saying he needed to use the bathroom and needed to defecate, and unable at first to be dressed out. By his own account he concluded Roberts was intoxicated.

169. William Roberts's need for medical attention was objectively serious. He was in the course of a bowel ischemia that would kill him within four days.

170. Corporal Jordan was trained, as Georgia law required, that "[u]ntreated withdrawal can be fatal" and that "[a] quick referral to medical staff is required"; that "extreme intoxication from drugs or alcohol" is a condition warranting refusal of an arrestee under O.C.G.A. § 42-4-12, upon which the arresting agency must obtain a medical release; and that "[a]ll new inmates must undergo a health screening as soon as possible after admission."

171. His stated belief that the intoxication was alcohol rather than drugs does not assist him. The training text names drugs or alcohol. Either way the duty was the same.

172. Corporal Jordan did not refuse acceptance. He did not document a refusal. He did not perform or request a health screening. He did not summon medical staff. He did not take a vital sign. He did not enter Roberts into the Eagle system. He placed Roberts in a holding cell that had no restroom, knowing Roberts had said he could not control his bowels.

173. Corporal Jordan was actually, subjectively aware that his own conduct — placing a man he had concluded was extremely intoxicated into a cell without obtaining any medical assessment — caused a substantial risk of serious harm, and he disregarded that risk. He made no response to it at all, and a failure to respond is not a reasonable response.

174. Approximately thirty hours later, Corporal Jordan personally brought William Roberts out of the jail and released him on foot, alone, with no medical assessment having been performed at any point, on the strength of nothing more than an officer's impression that Roberts was "acting better."

175. Corporal Jordan told the Georgia Bureau of Investigation that Roberts "was seen by medical at intake." NaphCare's records contain no entry for William Roberts and its staff had no recollection of him.

176. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count. Qualified immunity does not apply, for the reasons stated in Count I.

## COUNT V
## 42 U.S.C. § 1983 — Fourteenth Amendment
## Against Sergeant Alissia Thomas, in her individual capacity

177. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 27–47, 48–55, 56–60, 69–72, 73–84, 97–112, and 133–136 as if fully set forth herein.

178. Sergeant Thomas was an A-shift sergeant at the Newton County Detention Center on April 22, 2023.

179. Sergeant Thomas came to the intake area while William Roberts was seated beside the intake computer in visible distress, spoke with Deputy Allen and with Roberts, and watched as Roberts was placed in a holding cell.

180. Unlike Corporal Jordan, Sergeant Thomas understood that Roberts was under the influence of alcohol and drugs. She told the Georgia Bureau of Investigation so, and added that he had been arrested where homeless people stay and had defecated on the side of the street.

181. Sergeant Thomas also understood the practice. She told the Georgia Bureau of Investigation that Roberts "may not have been booked because of drunk behavior," and that "if a deputy brings in a drunk person sometimes, they let them sober up and then let back out."

182. After Roberts was placed in the cell, Sergeant Thomas returned to the intake computer, left it, looked over at Roberts's cell, and walked back into the jail. She then returned to intake with a different inmate and booked that inmate in. She afterward walked toward Roberts's cell and spoke to him.

183. Sergeant Thomas therefore performed, minutes apart and at the same console, the booking that triggers medical notification — for another detainee, and not for William Roberts.

184. Sergeant Thomas did not perform or request a health screening, summon medical staff, take a vital sign, or enter Roberts into the Eagle system.

185. Sergeant Thomas was actually, subjectively aware that her own conduct — leaving a man she knew to be under the influence of drugs in a holding cell without a medical assessment, while booking another detainee in his presence — caused a substantial risk of serious harm, and she disregarded it.

186. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count. Qualified immunity does not apply, for the reasons stated in Count I.

**COUNT VI**
**42 U.S.C. § 1983 — Fourteenth Amendment**
**Against A-Shift Detention Officers 1 through 5**

187. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 48–55, 56–60, 61–65, 69–72, 73–84, 97–112, 128–132, and 133–136 as if fully set forth herein.

188. Plaintiffs plead this Count subject to, and contingent upon, the Court's disposition of Plaintiffs' Motion for Reconsideration [Doc. 51]. Counsel is aware of the Court's ruling dismissing the previously pleaded unknown deputies, and of *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010), and *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992). These Defendants are identified by shift,

by the named supervisor to whom they reported, by post and assignment, by cell block and cell, and by the duty of direct or video observation that the assignment carried — that being as close to *Dean*'s standard as the stay of discovery permits. The shift roster, post assignment sheet, watch log and interior video would supply their names in a single afternoon; none has been produced. If the Court adheres to its ruling, this Count may be stricken without response and without further briefing, and Plaintiffs will substitute true names promptly upon obtaining the records that supply them.

189. These Defendants worked the A shift, 7:00 a.m. to 7:00 p.m., on April 22 and April 23, 2023, under the supervision of Corporal Jordan and Sergeant Thomas. Their assigned posts and duties placed William Roberts within their direct or video observation, including the holding cell in which he was held.

190. Those duties included observing detainees in the holding area, conducting and recording welfare checks, and reporting and referring detainees who appeared to require medical attention.

191. William Roberts was in visible distress throughout. He was in nearly constant motion, rocking, doubling over, holding his stomach, saying he needed to defecate, and confined in a cell without a restroom while unable to control his bowels.

192. Each of these Defendants was trained, as Georgia law required, that untreated withdrawal can be fatal and that a quick referral to medical staff is required.

193. On information and belief, no A-shift officer performed a health screening, summoned medical staff, took a vital sign, or referred William Roberts to the medical staff on duty at any time during the A shift on April 22 or April 23, 2023.

194. Each was actually, subjectively aware that his or her own conduct in leaving Roberts without medical attention caused a substantial risk of serious harm, and disregarded that risk.

195. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count. Qualified immunity does not apply, for the reasons stated in Count I.

**COUNT VII**
**42 U.S.C. § 1983 — Fourteenth Amendment**
**Against Sergeant Ramsey, in his or her individual capacity**

196. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 48–55, 56–60, 69–72, 73–84, 97–112, 128–132, and 133–136 as if fully set forth herein.

197. Sergeant Ramsey was the supervisor of the B or night shift at the Newton County Detention Center, which ran from 7:00 p.m. to 7:00 a.m.

198. William Roberts was in the Newton County Detention Center from approximately 10:52 a.m. on April 22, 2023 until approximately 5:52 p.m. on April 23, 2023. He was therefore in the jail for the entire B shift of 7:00 p.m. on April 22 to 7:00 a.m. on April 23 — a full, uninterrupted twelve-hour shift under Sergeant Ramsey's supervision.

199. As shift supervisor, Sergeant Ramsey was responsible for the custody, observation and welfare of every detainee held in the facility during that shift, including detainees in the holding area, and for ensuring that officers under his or her supervision conducted and recorded welfare checks and referred detainees who appeared to require medical attention.

200. During those twelve hours no medical assessment was obtained, no vital sign was taken, no health screening was performed, and no entry was made for William Roberts in the Eagle or TechCare systems.

201. On information and belief, Sergeant Ramsey knew that a detainee was being held in the intake or holding area to sober up without having been booked, knew that an unbooked detainee generates no notification to medical staff, and took no step to obtain a medical assessment for him.

202. Sergeant Ramsey was actually, subjectively aware that his or her own conduct in permitting a detainee in that condition to remain through an entire night shift without medical assessment caused a substantial risk of serious harm, and disregarded that risk.

203. In the alternative, Sergeant Ramsey is liable as a supervisor, in that the deprivation occurred throughout his or her shift pursuant to a custom or practice that Sergeant Ramsey enforced or permitted, and there is a causal connection between that conduct and the deprivation. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003); *Keith v. DeKalb County*, 749 F.3d 1034 (11th Cir. 2014).

204. Plaintiffs note that the Georgia Bureau of Investigation interviewed no officer who worked the B shift, and that the interior jail video for that period has never been produced. What occurred during those twelve hours is knowable only from records in Defendants' possession.

205. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its

Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count. Qualified immunity does not apply, for the reasons stated in Count I.

**COUNT VIII**
**42 U.S.C. § 1983 — Fourteenth Amendment**
**Against B-Shift Detention Officers 1 through 5**

206. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 48–55, 56–60, 69–72, 73–84, 97–112, 128–132, and 133–136 as if fully set forth herein.

207. Plaintiffs plead this Count subject to, and contingent upon, the Court's disposition of Plaintiffs' Motion for Reconsideration [Doc. 51]. Counsel is aware of the Court's ruling dismissing the previously pleaded unknown deputies, and of *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010), and *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992). These Defendants are identified by shift, by the named supervisor to whom they reported, by post and assignment, by cell block and cell, and by the duty of direct or video observation that the assignment carried — that being as close to *Dean*'s standard as the stay of discovery permits. The shift roster, post assignment sheet, watch log and interior video would supply their names in a single afternoon; none has been produced. If the Court adheres to its ruling, this Count may be stricken without response and without further

briefing, and Plaintiffs will substitute true names promptly upon obtaining the records that supply them.

208. These Defendants worked the B shift, 7:00 p.m. to 7:00 a.m., on April 22 and April 23, 2023, under the supervision of Sergeant Ramsey. Their assigned posts and duties placed William Roberts within their direct or video observation, including the holding cell in which he was held.

209. Those duties included observing detainees in the holding area, conducting and recording welfare checks, and reporting and referring detainees who appeared to require medical attention.

210. William Roberts was in their custody for the entire twelve-hour shift, in a cell without a restroom, unable to control his bowels, with a progressing bowel ischemia.

211. Each of these Defendants was trained, as Georgia law required, that untreated withdrawal can be fatal and that a quick referral to medical staff is required.

212. On information and belief, no B-shift officer performed a health screening, summoned medical staff, took a vital sign, or referred William Roberts to the medical staff on duty at any time during that shift.

213. Each was actually, subjectively aware that his or her own conduct in leaving Roberts without medical attention through the night caused a substantial risk of serious harm, and disregarded that risk.

214. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count. Qualified immunity does not apply, for the reasons stated in Count I.

## COUNT IX
## 42 U.S.C. § 1983 — Fourteenth Amendment
## Against Corporal Jemon Jordan, in his individual capacity
## Release of a man in medical distress, without care and without notice to anyone

215. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 56–60, 61–65, 66–68, 69–72, 73–84, and 133–136 as if fully set forth herein.

216. At approximately 5:52 p.m. on April 23, 2023, Corporal Jordan brought William Roberts out of the jail and released him on foot, alone, into the open.

217. Roberts had by then been held approximately thirty hours without a single medical assessment, vital sign, or contact with a nurse. He had entered the jail reporting that he could not breathe, that he was dehydrated, that he had not had

a bowel movement in eleven days, and that he was vomiting and could not stop having diarrhea.

218. The only assessment that preceded his release was a custody officer's impression that he was "acting better." No medical professional cleared him for release. On information and belief no medical professional was asked.

219. Approximately three minutes after Roberts was put out of the building, a nurse walked from the jail into the intake area and spoke with an officer there. Medical staff were within feet of the door through which Roberts had just been released.

220. Releasing a person in that condition, on foot and alone, did not end the risk to him. It removed him from the only place where anyone was in a position to observe his deterioration, while leaving him as sick as he had been when he arrived — and sicker.

221. Corporal Jordan also did not notify, and on information and belief no Defendant notified, any member of William Roberts's family that he was in custody or that he was being released. Roberts's family had telephoned the jail every day from April 21 through April 25, 2023 and had been told each time that he was not there.

222. Had the family been told he was in custody, they could have brought his prescribed medications, told the jail of his chronic obstructive pulmonary disease and asthma, or arranged to collect him and take him to a hospital.

223. William Roberts walked a short distance, bent over on the driveway, used a portable toilet on the grounds, and lay down behind the Sheriff's Office entrance sign. He was found dead there three days later.

224. Corporal Jordan was actually, subjectively aware that his own conduct in releasing a man in that condition, without a medical assessment and without notice to anyone who could help him, caused a substantial risk of serious harm, and disregarded that risk.

225. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count. Qualified immunity does not apply, for the reasons stated in Count I.

**COUNT X**
**42 U.S.C. § 1983 — Fourteenth Amendment**
**Against Sheriff Ezell Brown, in his individual capacity**
**The practice of not recording, and therefore not disclosing, unbooked detainees**

226. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 48–55, 56–60, 61–65, 66–68, 69–72, 73–84, and 133–136 as if fully set forth herein.

227. The practice alleged in Count I had a second consequence, and it was foreseeable. A detainee who is never booked generates no record in the jail's system. When a family member telephones to ask whether he is there, the jail has nothing to find, and reports that he is not there.

228. That is what happened. William Roberts's family called the Newton County Detention Center every day from April 21 through April 25, 2023. They were told every time that he was not there. He was there from April 22 until the evening of April 23, and for three days after that he was lying dead on the Sheriff's own grounds.

229. Sheriff Brown knew, or the risk was so obvious that he must be charged with knowing, that a practice of holding detainees without booking them would render those detainees invisible to inquiry by their families.

230. The danger is at its height for precisely the category of detainee the practice captures. A person held to "sober up" without medical screening is a

person whose family is often the only source of his medical history, his prescribed medications, and the means to obtain care for him. Cutting that person off from his family removes the last safeguard after the medical one has already been removed.

231. Sheriff Brown created, approved, maintained, or knowingly acquiesced in that practice and its consequence, and was actually, subjectively aware that his own conduct caused a substantial risk of serious harm, which he disregarded.

232. As a direct and proximate result, William Roberts's family was deprived of any opportunity to intervene, and William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count. Qualified immunity does not apply, for the reasons stated in Count I.

## COUNT XI
## Negligent Undertaking — Restatement (Second) of Torts § 324A
## Against NaphCare, Inc.

233. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 27–47, 48–55, 56–60, 69–72, 73–84, 113–127, and 133–136 as if fully set forth herein.

234. Georgia has adopted Restatement (Second) of Torts § 324A. *Huggins v. Aetna Casualty & Surety Co.*, 245 Ga. 248 (1980).

235. The Sheriff of Newton County owes a statutory duty to furnish persons confined in his jail with medical aid. O.C.G.A. § 42-4-4(a)(2).

236. NaphCare, for consideration, undertook to perform that duty — agreeing to provide health care meeting constitutional and national correctional health care standards, to evaluate and medically clear inmates with an obvious or known illness before booking, and to train the Sheriff's correctional officers in the signs and symptoms of chemical dependency and responses to medical emergencies. [¶¶ 111–19.]

237. NaphCare should have recognized, and did recognize, that those services were necessary for the protection of the persons confined in the jail.

238. NaphCare failed to exercise reasonable care in that undertaking, in the particulars set out in Count II.

239. NaphCare is therefore subject to liability to William Roberts because (a) its failure to exercise reasonable care increased the risk of harm — a booking-only notification trigger, operating in a jail that did not book intoxicated arrestees, routed the highest-risk detainees around medical care entirely; (b) it had undertaken to perform a duty owed by the Sheriff to the detainee; and (c) harm was suffered because of reliance upon the undertaking — the Sheriff relied in

contracting for it, and Deputy Allen relied expressly, refusing William Roberts's request for a hospital on the ground that "[w]e have nursing staff, Sir."

240. No privity of contract is required. Plaintiffs sue in tort, not on the contract.

241. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count.

**COUNT XII**
**Ordinary and Administrative Negligence**
**Against NaphCare, Inc.**

242. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 48–55, 56–60, 69–72, 73–84, 113–127, and 133–136 as if fully set forth herein.

243. Independent of any exercise of professional medical judgment, NaphCare owed a duty of ordinary care in the design and administration of the health care system it operated at the Newton County Detention Center.

244. NaphCare breached that duty by failing to build any mechanism by which a detainee who was not booked could be identified and seen; by failing to deliver and document the officer health education it had contracted to provide; by failing to identify and eliminate barriers to access as its own policy required; by

failing to notify its corporate office of such barriers; and by failing to monitor receiving screenings for safety and effectiveness.

245. Each of these is an administrative failure — a failure to build, staff, train, audit and supervise a system — and not an exercise of professional medical judgment. No expert affidavit under O.C.G.A. § 9-11-9.1 is required to state this claim.

246. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count.

**COUNT XIII**
**Respondeat Superior**
**Against NaphCare, Inc.**

247. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 56–60, 113–127, and 133–136 as if fully set forth herein.

248. The health care personnel who staffed the Newton County Detention Center on April 22 and April 23, 2023 — were at all relevant times acting within the course and scope of their employment or engagement by NaphCare, Inc.

249. NaphCare is liable under Georgia law for the negligent acts and omissions of those personnel committed within the course and scope of that employment or engagement.

250. NaphCare has contractually foreclosed any independent-contractor defense. Section 2.5 of the Agreement provides that NaphCare remains fully liable and responsible for services performed by its independent contractors and subcontractors. [¶¶ 120–21.]

## COUNT XIV
## Negligent Breach of a Ministerial Duty
## Against Sheriff Brown, Captain Smith, Corporal Jordan, Sergeant Thomas, Sergeant Ramsey, and the A-Shift and B-Shift Detention Officers

251. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 48–55, 56–60, 61–65, 69–72, 73–84, 97–112, and 133–136 as if fully set forth herein.

252. O.C.G.A. § 42-4-4(a)(2) requires the sheriff to furnish persons confined in the jail with medical aid, and O.C.G.A. § 42-4-12 authorizes the keeper of a jail to refuse acceptance of a person presenting a condition of an emergency nature who has not received medical treatment.

253. Under Georgia law the provision of adequate medical attention to inmates is a ministerial act, “because medical care is a fundamental right and is not

discretionary," and is therefore not protected by official immunity. *Cantrell v. Thurman*, 231 Ga. App. 510, 514, 499 S.E.2d 416, 421 (1998).

254. Under Georgia law, whether to provide medical attention to an inmate is a ministerial act; what treatment to provide is discretionary. *Cantrell*, 499 S.E.2d at 421. This Count alleges the former and not the latter. It is not a disagreement about a course of treatment chosen. No course of treatment was ever chosen, because no medical judgment was ever made. William Roberts was never screened, never assessed, never examined, and never treated. He received no medical care of any kind during approximately thirty hours in the Newton County Detention Center.

255. These Defendants negligently failed to perform that ministerial duty.

256. To the extent official immunity would otherwise shield any Defendant, it is waived to the extent of the Sheriff's official bond. O.C.G.A. § 15-16-5.

257. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count.

**COUNT XV**
**42 U.S.C. § 1983 — Fourteenth Amendment**
**Against Captain Brice Smith, in his individual capacity**

258. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 48–55, 56–60, 61–65, 69–72, 73–84, 97–112, 113–127, 128–132, and 133–136 as if fully set forth herein.

259. Captain Brice Smith was the Jail Captain of the Newton County Sheriff's Office and held operational command of the Newton County Detention Center on April 22 and April 23, 2023.

260. In that role he was responsible for the booking and intake practices of the facility, for the supervision of the A-shift and B-shift supervisors, and for ensuring that his detention officers received and remained current in the health-related training that Georgia law and the facility's own policies required.

261. The practice of holding arrestees taken in on apparent public intoxication without booking them — and therefore without any medical screening — operated in the facility Captain Smith commanded, and was described to the Georgia Bureau of Investigation as routine by the very shift supervisors who reported to him.

262. On information and belief, Captain Smith knew of that practice, permitted it, and took no step to stop it; and he knew or should have known that the officer health education NaphCare had contracted to provide under the Agreement

and policy C-04 was not being delivered or documented, including the requirement that at least seventy-five percent of the correctional staff present on each shift be current in health-related training.

263. Captain Smith was actually, subjectively aware that his own conduct in permitting that practice to operate in the facility he commanded, and in failing to ensure that his officers were trained to recognize intoxication, overdose and withdrawal and to refer such detainees for medical assessment, caused a substantial risk of serious harm to detainees in that category, and he disregarded that risk.

264. In the alternative, Captain Smith is liable as a supervisor, in that a custom or practice under which his subordinates acted caused the deprivation and there is a causal connection between his conduct and that deprivation. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003); *Keith v. DeKalb County*, 749 F.3d 1034 (11th Cir. 2014).

265. As a direct and proximate result, William Roberts endured conscious, pre-death pain and suffering, for which the Estate seeks recovery through its Administrator under O.C.G.A. § 9-2-41, and he died, for which his surviving children seek the full value of his life under O.C.G.A. §§ 51-4-1 and 51-4-2(a). Plaintiffs seek both measures of damages on this Count. Qualified immunity does not apply, for the reasons stated in Count I.

**COUNT XVI**
**Wrongful Death — O.C.G.A. §§ 51-4-1 and 51-4-2(a)**
**By Liyah Roberts and Izaiah Roberts, Against All Defendants**

266. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 27–47, 48–55, 56–60, 61–65, 66–68, 69–72, 73–84, and 133–136 as if fully set forth herein.

267. Liyah Roberts and Izaiah Roberts are the surviving children and next of kin of William Jamison Roberts and have standing to bring this claim. O.C.G.A. § 51-4-2(a).

268. The acts and omissions alleged in Counts I through XV and XVIII caused the death of William Jamison Roberts, and where one or more defendants, individually or jointly caused the death of Roberts, by one or more acts or refusals to follow a duty under the law causing one or deprivation of federal rights, or by subjecting Roberts to a deprivation of federal rights, leading to conscious suffering and then death.

269. Plaintiffs are entitled to recover the full value of the life of the decedent, as measured from the decedent's point of view, without deduction for necessary or personal expenses. O.C.G.A. § 51-4-1(1).

270. The recovery is held for the benefit of all surviving children in equal shares.

**COUNT XVII**
**Survival Claim — O.C.G.A. § 9-2-41**
**By Kenneth Roberts, as Administrator, Against All Defendants**

271. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 27–47, 48–55, 56–60, 61–65, 69–72, 73–84, and 133–136 as if fully set forth herein.

272. Kenneth Roberts, as Administrator of the Estate of William Jamison Roberts, brings the claims that survived the decedent's death.

273. Between his arrival at the Newton County Detention Center on April 22, 2023 and his death, William Roberts endured conscious pain and suffering — progressive bowel ischemia, severe abdominal cramping and pain, dehydration, uncontrolled diarrhea and vomiting, difficulty breathing, and the fear and distress of being unable to obtain help after asking for it.

274. The Estate is entitled to recover for that conscious pain and suffering, and for funeral, burial and related expenses.

**COUNT XVIII**
**42 U.S.C. § 1983 — Fourteenth Amendment (Monell)**
**Against Newton County**
Independent County Policy: Structuring and Administering the NaphCare Agreement
to Create a Financial Incentive to Deny Medical Assessment

275. Plaintiffs reallege and incorporate paragraphs 4–6, 7–9, 10–23, 24, 27–47, 48–55, 56–60, 61–65, 69–72, 73–84, 97–112, 113–127, and 133–136 as if fully set forth herein.

## I. A County May Be Liable for Its Own Policy

276. A county may be liable under § 1983 only for its own policy or custom, not solely because a sheriff, deputy, jailer, or contractor committed a constitutional violation. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978). A county policy may arise from a deliberate decision by officials possessing final authority over county contracting and fiscal administration—here, the Newton County Board of Commissioners.

277. This Count does not seek to hold Newton County vicariously liable for the conduct of Sheriff Brown or his deputies. It does not allege that Commissioners merely agreed with, funded, approved, or declined to oppose a sheriff-controlled medical-care policy. See *Myrick v. Fulton County*, 69 F.4th 1277 (11th Cir. 2023) (affirming summary judgment where county's involvement did not rise above passive funding of sheriff's decisions). Instead, it alleges that the Commissioners exercised their own, independent authority over county contracting and county appropriations to structure, approve, and maintain a contractual framework that itself created the financial incentive to deny medical assessment.

278. In *Smothers v. Childers*, 159 F.4th 922 (11th Cir. 2025), the Eleventh Circuit held that a state's assignment of responsibility for administering jail healthcare to the sheriff does not categorically bar county liability. Where the county itself knowingly contracted with an incompetent exclusive medical provider whose contract design foreseeably denied care, the county may be liable for its own contracting decision, independent of any sheriff-level policy. Id.

279. *Smothers* arose under Alabama law. Georgia expressly places the duty to furnish medical aid on the sheriff, O.C.G.A. § 42-4-4(a)(2), and the Georgia Supreme Court has held that the sheriff controls selection of the jail medical provider, *Bd. of Comm'rs v. Stewart*, 284 Ga. 573, 573 (2008). Accordingly, this Count does not allege that the Commissioners selected NaphCare, directed the sheriff's medical-care operations, or assumed the sheriff's statutory duty. Rather, it alleges that the Commissioners exercised their own, separate authority over the county purse and county contracting to structure a financial architecture that created the incentive for the denial of care.

## II. The Commissioners' Independent Decisions

280. The Newton County Board of Commissioners, acting collectively as the County's governing authority, exercised their lawful authority over county

contracting, county appropriations, and the county treasury to make the following independent decisions:

(a) The Commissioners entered into and repeatedly renewed the NaphCare Health Services Agreement, a county contract funded by county appropriations. [NaphCare K § 1.1 Bates 000001.] While the sheriff is authorized to select the medical provider, the county board controls the appropriation of funds. O.C.G.A. § 36-5-22.1; *Lawson v. Lincoln County*, 292 Ga. App. 527, 529–30 (2008). The Commissioners' execution of the Agreement was an independent act of county contracting authority.

(b) The Commissioners approved a compensation structure under Section 9.1 that calculated the County's base payment on an average daily jail population of 650 inmates or fewer, with per diem surcharges for each inmate above that threshold. [NaphCare K § 9.1 Bates 000009; Bates 000028.] This structure created a direct county fiscal interest in keeping the reported inmate count as low as possible.

(c) The Commissioners approved a scope-of-services trigger under Section 1.2 that limited NaphCare's medical obligations to inmates "physically booked and present" at the Facility. [NaphCare K § 1.2 Bates 000001–02.] This term meant that any person held at the Detention Center

but not formally booked fell outside the scope of NaphCare's contractual duty to provide medical services.

(d) The Commissioners approved a cost-allocation provision under Section 1.8 that placed the financial responsibility for treatment of any person who was injured or became ill prior to booking entirely on the County, while NaphCare bore no financial responsibility for such treatment. [NaphCare K § 1.8 Bates 000002.] This provision created a direct cost to the County for every unbooked detainee who was evaluated and found to need treatment.

(e) The Commissioners approved a Risk Pool provision under Section 1.9 that capped NaphCare's liability for off-site medical costs at a fixed dollar amount per contract year, with the County bearing full responsibility above the cap and receiving a ninety-percent rebate of any unused portion. [NaphCare K § 1.9 Bates 000002–03.] The rebate gave the County a direct financial return for every dollar of off-site medical spending that was avoided.

(f) The Commissioners approved and renewed this contractual architecture through successive option-year amendments, including the option year four amendment effective July 1, 2022—the contract year in which William Roberts was detained and died. [NaphCare K Bates 000028.]

## III. The County-Controlled Mechanism

281. The county-controlled mechanism through which the Commissioners' decisions caused the denial of medical assessment was the NaphCare Agreement's financial architecture itself. The Agreement was not merely the sheriff's operational tool for administering jail medical care. It was a county contract, funded by county appropriations, executed under the Commissioners' contracting authority, and structured by terms the Commissioners approved. The financial incentives embedded in those terms operated independently of any sheriff directive; they created a structural pressure to minimize the number of persons booked and medically assessed regardless of who made operational decisions at the jail.

282. The Agreement's interlocking provisions created a structural financial incentive to minimize the number of persons booked and medically assessed. For any person brought to the Detention Center who presented with apparent illness:

(a) If the person was evaluated before booking and found ill, the County paid for treatment (Section 1.8);

(b) If the person was booked and then found ill, NaphCare paid for treatment up to the Risk Pool cap, above which the County paid (Sections 1.5, 1.9); and

(c) If the person was never booked and never evaluated, no treatment was provided and neither the County nor NaphCare paid anything.

283. Option (c) was the cheapest outcome for the County under every provision of the Agreement. By structuring, approving, and maintaining a contract under which unbooked detainees fell entirely outside the medical-services framework, the Commissioners created the financial architecture that made non-booking the path of least fiscal resistance—and the path that resulted in no medical assessment whatsoever.

**IV. The Commissioners' Knowledge**

284. On information and belief, the Newton County Board of Commissioners knew that the no-booking practice was reducing the number of medical assessments performed at the Detention Center. The Commissioners approved and renewed the Agreement's compensation structure, accepted Risk Pool rebates, and administered the county budget from which NaphCare was paid. These fiscal responsibilities gave the Commissioners actual or constructive knowledge that fewer bookings meant fewer assessments and lower county medical expenditures.

285. On information and belief, the Commissioners knew or should have known that reducing medical assessments through non-booking would prevent medically qualified personnel from distinguishing ordinary intoxication from drug

overdose, alcohol poisoning, withdrawal, or another serious condition—conditions presenting a substantial risk of serious harm, including death.

286. The Commissioners maintained the contractual architecture despite that known risk because fewer assessments reduced county expenditures. The Risk Pool rebate provision gave the County a direct financial return for every dollar of off-site medical cost that was avoided by not booking and not screening detainees.

**V. Causation and Injury**

287. The county-controlled policy—the NaphCare Agreement's financial architecture, as structured, approved, and maintained by the Commissioners—caused the sheriff, NaphCare, and other participants to deny medical assessment to William Roberts.

288. The distinction between causation and mere concurrence is critical. If the sheriff could have adopted, changed, or rescinded the no-booking practice without county authorization, and the Commissioners merely expected to benefit from his decision, the facts would point toward a sheriff policy rather than a county policy. Plaintiffs allege, however, that the Commissioners' structuring of the Agreement's financial architecture independently created the incentive for non-booking. The Commissioners could have structured the contract differently: they could have required NaphCare to provide medical services to all persons held at the Detention Center regardless of booking status; they could have eliminated the

"physically booked and present" trigger; they could have removed the cost-allocation provision that penalized the County for pre-booking medical evaluations. They did none of these things.

289. William Roberts was detained on April 22, 2023. He was not booked. He was not screened. He was not treated. He died on April 26, 2023, of bowel ischemia. The Sheriff's policy, procedure or custom, of not booking those charged with intoxication, that denied such class of detainees to medical assessment them access to medical assessment and health care, and the County's contractual architecture, and the failure of NaphCare to correct the policy and processes that denied health care to detainees and inmates, was a moving and joint force behind the deprivation of the constitutional right to necessary medical care under the Fourteenth Amendment.

290. As a direct and proximate result of the County's policy, William Roberts endured conscious, pre-death pain and suffering, and he died.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

a. Grant trial by jury on all issues so triable;

b. Award the Estate of William Jamison Roberts, through its Administrator, damages for the conscious pain and suffering of the decedent and for funeral, burial and related expenses;

c. Award Liyah Roberts and Izaiah Roberts the full value of the life of William Jamison Roberts for the death, caused by one or more defendants, individually or jointly, for causing an deprivation of federal rights or breach of state-imposed duty;

d. Award punitive damages against each individual Defendant and against NaphCare, Inc. (under a successful state claim) as permitted by law, where the facts show willful or wanton disregard, recklessness or deliberate indifference to the rights of all under the law;

e. Award compensatory damages against Newton County, Georgia for its unconstitutional policy and the conscious suffering and death it caused;

f. Award attorney's fees and costs under 42 U.S.C. § 1988 and as otherwise permitted by law;

g. Award pre-judgment and post-judgment interest as permitted by law; and

h. Grant such other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

**RELATED CASE**

This action is related to *Roberts v. Allen*, Civil Action No. 1:25-cv-02239-SDG, now pending before the Honorable Steven D. Grimberg, and arises from the same events. A notice of related case is filed herewith pursuant to Local Rule 3.1B.

Plaintiffs will promptly move to consolidate the two actions under Fed. R. Civ. P. 42(a). In the event of consolidation, all claims from both actions—including Count XVIII against Newton County, Georgia, which is asserted only in this action—will proceed in the consolidated proceeding. If the Court grants both consolidation and Plaintiffs' motion for leave to amend the complaint in Roberts v. Allen, Plaintiffs will move to voluntarily dismiss the overlapping individual-capacity and NaphCare claims asserted in this action, as those claims will be subsumed in the amended complaint in that action. Count XVIII, which has no counterpart in Roberts v. Allen, will be preserved.

Respectfully submitted this 30th day of October, 2026.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
1104 Milledge Road
Augusta, GA 30904
(706) 737-3090
Fax (706) 736-3391
jpbatson@aol.com

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing has been prepared in Times New Roman, 14 point, one of the font and point selections approved by the Court.

This the 28th day of October, 2026.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
1104 Milledge Road
Augusta, GA 30904
(706) 737-3090
Fax (706) 736-3391
jpbatson@aol.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the Complaint for Damages was filed with the Clerk of Court using the CM/ECF system, which will provide service to all attorneys of record:

HUFF, POWELL & BAILEY, LLC
Antonio Veal, Esq.
Michael Frankson, Esq.
999 Peachtree Street NE, Ste 950
Atlanta, GA 30309
aveal@huffpowellbailey.com
mfrankson@huffpowellbailey.com
Attorneys for Defendants Gregory Lowe, Bridgett Eiland,
Stephen Perry and Donna Roundtree

Cruser, Mitchell, Novitz, Sanchez,
Gaston & Zimet, LLP
Edward B. Greenblat
Email: egreenblat@cmlawfirm.com
Direct Dial: 678-684-1759
Karen E. Woodward
Georgia Bar No. 775260
Email: kwoodward@cmlawfirm.com
Direct Dial: 404-881-2623
Meridian II, Suite 2000
275 Scientific Drive
Peachtree Corners, GA 30092
Counsel for Defendant Allen

Wm. Thomas Craig, LLC
William Thomas Craig
PO Box 1587
Covington, GA 30015
Telephone: 770-880-9600
Facsimile: 404-881-2630
wtcraig@wtcraig.com
Counsel for Defendant Allen

Respectfully submitted this 28th day of October, 2026.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
1104 Milledge Road
Augusta, GA 30904
(706) 737-3090
Fax (706) 736-3391
jpbatson@aol.com